We have the pleasure today to have sitting with us on the quorum, Judge Eugene Seiler from the Sixth Circuit. This court just couldn't do its work if it didn't have the assistance of visiting judges who were nice enough to come. This is not the first time Judge Seiler has come, and our own senior district judges. So on behalf of Judge Barry and myself and the entire circuit, we thank you, we welcome you, and I'm sure the lawyers look forward to hearing from you also. You're quite welcome. Glad to be here. Okay, we'll hear Feigenbaum v. Merrill Lynch. Good morning, Your Honors. Good morning, Mr. Barber. Yes, ma'am. I would like to reserve five minutes for rebuttal, please. That's granted. Yes, thank you, Your Honor. May it please the Court, MetLife's termination of Ms. Feigenbaum's benefits cannot stand under ERISA, and I'd like to tell this panel why. First and foremost, MetLife's denial of Ms. Feigenbaum's benefits was based upon an inconsistent treatment of the identical 139 pages of medical records that MetLife had reviewed for the three previous years on five separate review occasions. Well, can people get better? I mean, the fact that she was disabled before doesn't necessarily mean that she's disabled now. Absolutely, Your Honor. However, there is absolutely no evidence within this administrative record that Ms. Feigenbaum, in fact, got better. There's also no evidence that she was being treated after April or was it August of 2001. You had a few physical therapy records, and then you had Dr. Kaplan's report and notes which essentially said, I haven't seen her for four years and I'm not qualified to evaluate. That's really all you had in those three years, and it was stale, wasn't it, if indeed she was still as bad as she had been in 2001? Respectfully, Your Honor, I would disagree, and I would disagree on the basis of the JFK rehabilitation notes. My client was continuing to go through rehabilitation to correct these vestibular problems. She went through two separate surgeries, and right through 2003 — But the surgeries were way back. The surgeries were back. Surgeries, there were two. The last surgery was in November of 2002, Your Honor. Yes. That was the second vestibular surgery, and then you had my client, based upon her doctor's recommendation — Excuse me. I misspoke when I said 2001. I meant 2003. Yes, Your Honor. Go ahead. But on this record, Ms. Fiegenbaum was continuing to go through rehabilitation, and I think there's a critical entry in these diary notes, and it's the November 3, 2003 entry. And it's MetLife receives these medical records from JFK Rehabilitation Center. Their own claims analyst reviews these records, and if you look at the diary notes, it says, continue benefits. So they made the determination, based upon these physical therapy records, to continue benefits. Interestingly — When was that, 2003? 2003, yes, Your Honor. November 3, 2003, A504 in the record. And did the notes say she continues to be disabled? Yes. It specifically — It does say continue benefits. Does it say because she — I mean, beside that, what else does it say? It actually, Your Honor, goes through a very detailed analysis of these handwritten PT notes, picks up on the various objective evidence of her disability. For example, the tandem walking exercises that she — that were worked on during this rehabilitation. And then, interestingly, 51 days later, without any other developments in the record, without any other information, is when this gets referred out to Dr. Hopkins for review. And this is essentially when Dr. Hopkins, based upon the identical information that MetLife had approved this disability for for three years, she comes to diametrically opposed conclusions as to what had happened before. Is she an independent physician? They claim she's an independent physician, Your Honor. I believe — and on that note, I believe if we had have been permitted very limited discovery as to Dr. Hopkins' bias, we would have been able to determine that she, in fact, wasn't an independent physician. In our supplemental brief to this Court, we provided this Court with information from other cases involving Dr. Hopkins, where the majority of her income for 2003, the year she — We haven't accepted that information yet. Okay. Yes, ma'am. There's still a motion pending to file a supplemental appendix. Yes. And that's outside the administrative record. It is outside the administrative record, Your Honor, but I believe Glenn speaks to that. And, frankly, the earlier Pinto, Kosiva, and earlier Third Circuit precedent speaks to that. Well, there's some question as to whether our precedent is still viable in light of the Supreme Court's decision in Glenn. I would respectfully submit, Your Honor, that my reading of Glenn overrules this circuit's precedent with respect to the sliding scale. Yeah. But I believe that the discussions within those cases, when it looks at procedural regularities, when it looks at bias, when it looks at conflict of interest, frankly, Judge Becker and Judge Ambrose and Post, they did exactly what the Supreme Court discussed, to look at these combination of factors to determine whether or not there was abuse of discretion. In Pinto, Kosiva, and Post, the courts focused on the case-specific information before it. So I agree that that was outside the administrative record, but I think it's now clear in Glenn that, based upon this combination of review, that the court can go outside the administrative record to determine whether or not an administrator has substantively or procedurally abused discretion. It's a very, and that's not to say, and I want to make perfectly clear to this panel, it is not to say, however, when it comes to reviewing the actual substantive decision with respect to eligibility, that is sacrosanct. That is the administrative record. When the curtain falls on the administrative record, that is the only information that this court is allowed to review in connection with the substantive benefit claim. However, and I believe both Glenn and our prior precedent stands for the proposition that you can go outside the administrative record on limited occasions to look at procedural bias. Wouldn't we be undermining the deference Glenn would accord even conflicted claim administrators if we permit the discovery that you seek? I mean, you actually seek a fair amount of discovery. You were seeking a fair amount of discovery. And this 28J letter that came in yesterday with the Eastern District of Missouri case attached, I thought there was an interesting observation in the magistrate judge's decision which said, even though she did give some limited discovery, she said, well, this is not an evidentiary proceeding. This is a review proceeding. And you really would seek to make it into an evidentiary proceeding, wouldn't it, with all the discovery that you were seeking? No, absolutely not, Your Honor. We were seeking discovery that went to the abuse of discretion standards that were in this case. To give you an example, Your Honor, this Dr. Hopkins and the information that Dr. Hopkins reviewed and her cherry-picking methodology. That's an inflammatory word. I don't know that I'd agree with you on that use of word. I don't mean to be inflammatory, Your Honor, but I think if you take a look at this record and the fact that when Dr. Hopkins reviewed the reports of Dr. Pratt, Dr. Cuppersmith, Dr. Olario, these are the same identical reports that MetLife's personnel had reviewed and came to an opposite conclusion. Yeah, but the real question is, what was her status at the time? And she got disability benefits for three years. So did she put in any affirmative evidence to show that she remained disabled? She had a witness statement, Your Honor, which explained her disability. No, no, in the current period, she had a what statement? She had a witness statement where she submitted her own personal statement. But on that note, and Your Honor discussed this in the Stratton case, frankly, MetLife took advantage of the information accessible to the parties and played to my client's lack of sophistication. But, Your Honor, if I can point out, it's critical to understand this in the record. MetLife, in its original approval letter, told my client, we will be requesting medical information from you. In other words, we are going to control what medical information we are going to request. We are going to control what medical information is in the record. Did MetLife invite a response by Dr. Olario and no response was had after Dr. Hopkins had made her analysis? That's right. I'm sorry, Your Honor, I didn't understand your question. Dr. Olario had the opportunity to respond right after Dr. Hopkins' report was sent to him. He got, apparently, an extension of time to respond and then never did. And then the first and only response he made subsequent to the decision was, I think your friends call it a 10-line letter, to whom it may concern. Concluding, you know, just concluding. But that's it. She was given every opportunity on January 21st, when her claim was denied, to come in with information, with medical documents, with anything to show that, in fact, their determination was in error. And came in with nothing but Dr. Olario's 10-line letter and her own statement. Just to quickly address this issue with Dr. Olario, and I think it's an important issue that this panel understand, when MetLife made that December 30th, 2003 request to Dr. Olario for medical information, it concealed that request from my client. It is – those are right – Well, it sent it to her doctor. I don't understand this concealing concept. It sent it to her doctor. Now, she says that she didn't know to go – that they needed a posterography test. But the information about the posterography test being needed was sent to her doctor. It's almost the same as if you send it to somebody's lawyer. He was her representative. Who should bear the burden of his not telling her about that? Your Honor, I do not believe in the record that MetLife ever requested a posterography test from Dr. Olario. What MetLife requested from Dr. Olario – No. Well, what they did, I think the information they got was there was something in the record that said she hadn't undergone it. That's correct. That's correct. Dr. Hahn – Okay. So he knew from that, if he had read it, that they thought that the posterography test was significant. Now, she did have one later. I don't know if that's a narrative. October. Before and after. She had one 1996 with the Rust Institute. 1996, five years before she stopped working and five years before she said she was disabled. She had one. Yes, Your Honor. And then she had one in October. Yes, Your Honor. Well after her time to appeal had run. Yes, that's correct, Your Honor. And it was never before the district court. No, it was not. But, Your Honor, I have to correct. I have to just point out one thing. Okay, because your red light is on. Go ahead. Finish this up. Just very quickly. MetLife never requested a posterography test from Dr. O'Leary. Well, did they have the – he had the note. He had information before him that they thought that it – MetLife is an it – that it thought it was significant. And my question, and I haven't gotten an answer to that, is who bears the burden of his failure to advise her that MetLife thought it was significant? I think in this case MetLife bears the burden because with respect to that December 30, 2003 letter to Dr. O'Leary, and if you look in the notes, the case manager on Feig and Baum's case specifically directed that that letter not be copied to my client. And for the – for a fiduciary to hide that letter. Well, they didn't hide it. They sent it to her doctor. But they also, Your Honor, not only did they not – but there is a specific reference in those diary notes where it says, unit manager directed me not to send to Feig and Baum. That is not – Okay, I'll tell you what. Let's hear from MetLife because they come up and let's hear its answer to your comment. Thank you. That's why we have both sides. Thank you. Good morning, Your Honors. Randy Knepper on behalf of MetLife, the Merlin defendants, which include the planned defendants that are named in the complaint. In answer – I think you should put down the mic a little so we – okay. Mr. Barber's a little taller than I am. A little. I suffer from that all the time. In answer to Mr. Barber's assertion with respect that we purposely concealed documentation. Yes. We did not purposely conceal documentation. First of all, as Your Honor pointed out, it was sent to Dr. Lario. Secondly, it was part of the administrative record. Yeah, but why did it say that they were not to send it to her? I can't answer that specifically, but I can answer – Isn't that a matter of some concern? No, because generally the first time that anything is sent is after a request for information. The fact that it was not sent is not really unusual. The ERISA is very much governed by a set of regulations. The set of regulations requires in the denial letter for us to tell Ms. Feigenbaum or any other participant that they have a right to review all documentation that was relevant to the claim determination. That was done here. If Ms. Feigenbaum requested a copy of the administrative record, she would have been provided with a copy of Judge – excuse me, she would have been provided with a copy of Dr. Hopkins' report. That would have been a long time later, wouldn't it? It would have been right after the denial. Okay. The first time it actually was requested, a copy of the administrative record, was after the uphold on appeal, and it was sent immediately two days after the request on appeal. And that really is what the regulations provide for, and it was not a matter of hiding it, it was a matter of it was never requested. Why was the same evidence sufficient to support an approval in November 2003, but not one month later when Dr. Hopkins' report was submitted? Your friend across the aisle attributes great significance to this. Your Honor, if you review what he's actually looking at, the diary review report, it's A504. What he's looking at and what it's titled is a summary of medical, and at the end of it it says continue LTD benefits and tasks for AR. Then it goes on to – it's not a matter of that we immediately denied it based upon the same evidence. It was based upon the lack of contemporaneous evidence there was a request for a medical review by an independent physician consultant made by a nurse consultant, and then the independent physician consultant examined the records and did not find proof regarding disability. Well, who wrote the continue benefits note, and what is the status of that person in the administrative review process within MetLife? I believe who wrote it was the claims representative. This is the first time this issue is being raised. It's being raised on appeal, so I didn't look at – I didn't investigate into the issue below. You even – but they raised that on – did they raise that in their brief? Yes, Your Honor. And you didn't look into it? I apologize. We were limited to the administrative record. Well, not – I know. You can't be limited if there's a motion pending saying we want to expand the record. I believe that it was the claims representative that was handling the file, and then it was later referred to a nurse – it was referred to a nurse consultant, and the nurse consultant requested the independent medical examination. I see. At the time that it was requested, as Your Honor pointed out, the records contained in the administrative record were completely stale. And we really are – Completely? I didn't hear that word. They're stale. The medical records – Oh, stale. I'm sorry. – are from – generally from 2001, a few records from 2002. In fact, the doctor that is the primary treating physician, the last evidence that we have that he treated her at all is from August 22, 2001. What is attempting to be done here is not to demonstrate that the claim determination was arbitrary and capricious, but to attack every step of MetLife's claims handling of this matter. There's absolutely no documentation in the administrative record that demonstrates that in January of 2004 when the claim was denied, Ms. Feigenbaum remained disabled. She got benefits up until that time, right? Yes. Okay. And the argument essentially being made on her behalf is once disabled, always disabled, that a person can never recover from being disabled. And this is despite, as being pointed out in the moving appellate brief, she worked until one week before her surgery. She had surgery that described her condition as night and day improved. Then it was recommended that she go for vestibular therapy. She went for vestibular therapy. And everything in the records reflect that her condition is improving, inclusive of the fact that she really stopped medical treatment. She wasn't seeing doctors. And then in 2003, August of 2003. She did see Kaplan, and Kaplan said that he told her, that she told him her condition had significantly improved. Yes. Yes, Your Honor. It was Dr. I was right about 2001. That's the only medical record, doctor's record, we have during that whole period of time. Yes, Your Honor. It was Dr. Kramer, and Dr. Kramer, in fact, was asked to complete a physical capacity evaluation, which would have identified her restrictions and limitations. And he wrote on it, on the side of it, that he was not qualified to do this. So there really was no medical documentation, which supported disability subsequent to. So during this entire period, when did she stop doing any kind of physical therapy? In August of 2003. She did physical therapy in 2001, 2002, and 2003. And then in August, from August 2003 until the cutoff date, there was no record of any physical therapy or medical seeking. No, and that is exactly what's sought in the denial letter. If you want to repeal the claim determination, submit medical records, submit objective evidence of disability. And rather than doing that, we received a letter from Dr. Olario, a 10-line letter that doesn't even qualify that he had seen her since 2001, and identifies that he is going to order tests, but no test results were ever submitted. That's the last time that he saw her was 2001, from the record. In accordance with the record, yes. Why was, what was the point of the note saying that they shouldn't send the information about the posterography test to Ms. Feigenbaum? Generally, my experience is that the independent physician consultant reports are not sent to the participant at the time they are gathered. They're sent to the doctors for comment and become part of the administrative record. I see. Let's talk a little about Glenn and pre-Glenn. Even pre-Glenn, wouldn't we look at procedural irregularities or allegations as to bias? Absolutely, Your Honor, but when they talk about procedural abnormalities, they're talking about procedural abnormalities contained within the administrative record, not discovery with respect to procedural abnormalities outside the administrative record. One thing that I'd like to point out is about the case from Missouri that is cited in the 28-J letter that was submitted this week. That case, limited discovery was allowed, and the district court actually did an excellent job of pointing out all the cases on discovery since then and basically candidly says that the courts are interpreting Glenn in different manners as to whether it allows discovery or not. But at the end of that decision, there is guidance or the court goes through what discovery it's going to allow, and one of the things that is sought is a deposition of the independent medical examiner that is denied, which is exactly what is being sought here. Well, yeah, but Glenn also talks about there shouldn't be any special procedural rules or evidentiary rules in ERISA cases, which means it could put us back to any normal civil case where you can seek discovery on an issue that you are raising, and they raise the issue of procedural bias here. Well, Glenn is important. It talks about whatever the answer to that issue. It is a factor, only a factor, and then it speaks of the tiebreaker, and I think my question for you is even if there had been the discovery or some of the discovery that Feigenbaum sought, even if it had been granted, at the end of the day under Glenn, the lack of evidence of disability would be so strong that it would be the tiebreaker and harmless error as to the discovery that could or should have been granted. It would be harmless error because if we're using it as a tiebreaker, we're not close on the balances to where we should tip it. Well, I guess what I'm saying, yeah, what I'm saying is even if there was procedural bias, at the end of the day there's no disability, or I'm exaggerating. Of course, there's some, you know. There's no documentation that support a contemporaneous disability, and any procedural abnormality or procedural bias is not going to change that. But I personally, I mean there's a problem that Glenn really does require a lot of interpretation. I think that it's not creating any burden of proof or evidentiary or procedural rules that were not in effect in the circuits beforehand. You can wall off the decider. If you could do things proactively, then it would be easier to say that there was no weight to that factor, that there was bias when you come to decide the totality, right? Yes, but I think you'd always wind up in the circumstance we are here. I mean, we have a situation where benefits were paid for three years despite the dearth of medical documentation, but all we're looking at with regard to procedural bias is the denial going on. We're not giving MetLife or Merlinch any credit for the period of time they were paying benefits. I didn't want to break in. Have you finished your? Okay. Isn't it a fact, though it may not be in the administrative record, that the posterography tests that she did take show some disability? Well, the posterography tests are not contained within the administrative record. No, no, that's not my question. My question is, isn't it a fact that that test, if we were to, is that one of the documents that is in, that is the subject of the motion to expand the record? No, it's part of what is the original appendix, but is not part of what was the administrative record. It was attached to your opposing counsel's certification, wasn't it, before the district court? Yes, Your Honor, and it shows some abnormality. I don't know that it's been translated into. Does it show what she can do and what she can't do? Why shouldn't we remand in some way to allow opening of the administrative record to put that in? Because to do that, first there would have to be a determination that the claim determination was arbitrary and capricious, and we're talking about a document that was first submitted in, I believe, 2007 or 2006 with respect to a claim denial in 2004. When was the test, when was that posterography? One was from 96 and one was from October of 2004. It was never submitted to MetLife contemporaneously at the time. We'll have to ask him why. And it really, it turns on Ted all the case law. When was it performed? October of 2004. October of 2004. The claim was denied in January of 2004. And they had how long to appeal, 45 days? 180 days. 180 days. So the appeal time had run when it was performed. It had already run when it was performed. Yes, but there was never an attempt to submit it until this litigation. Until 2008. And the Third Circuit has continually held that the court's review of a claim determination is limited to the administrative record, and continually, including in post, held that medical reports submitted for the first time during litigation will not be considered by this court. Okay. Thank you. Thank you. A few points. Foremost with respect to this medical records and my client not continuing for medical treatment, my client had undergone two separate vestibular surgeries. She had reached maximal medical recovery. And at that point in time, she then engaged in significant physical therapy. And I want to point something out. But she stopped sometime in August 2003. No, she continued to run. In fact, Dr. Hopkins, in her own report, said, EE started vestibular therapy on 7-30-03. The fact is that they stopped requesting records, and they then referred this to Dr. Hopkins to do the medical review. My client continued to go through vestibular surgery. I'm sorry, through vestibular physical therapy. And again, I point out that November 3, 2003, continued approval was based specifically on the physical therapy that my client was going through. Did she submit a documentation of physical therapy in late 2003 or at any time in 2004 when she was able to do so? No, Your Honor. And the reason is MetLife didn't request it. Again, Your Honor. But again, whose burden is it? Typically, it would be my client's burden, with the exception, Your Honor, that MetLife, in its approval letter, specifically told my client that we will be requesting medical information from you. And then the course of conduct for that entire three years, Your Honor, was MetLife affirmatively requesting information, and my client or my client's doctors, my client's physical therapy people providing it. But on January 20, assuming you're right, on January 21, 2004, it all changed. Because when that decision was made, they threw the ball explicitly to her to come forward with anything, anything that would help. Absolutely. And what did she come forward with? She came forward with Dr. Lario's letter, and she came forward with the statement. Did she come forward with any evidence to show that she was continuing physical therapy? That's a yes or no. No, I don't believe so, Your Honor. I don't believe she – well, actually, she – I take that back. I'm wrong. She did. She resubmitted her physical therapy notes, and those physical therapy notes had already been forwarded to MetLife. But did they go – that's right. Did they go to the – up to the – up to January of 2004? No, ma'am. They did not. Well, then, if she – okay. But the key here, and, Your Honor, Your Honor discussed it in Stratton. This is – MetLife is a sophisticated insurance company. There's this imbalance between the parties, this access to information. My client did this pro se. Lynn Fiegenbaum is a – she's a very good accountant. She was a very good employee for MetLife. But she is not an expert in ERISA. There was this – That's true. In all these ERISA cases, right? Now, most all of them. And a lot of – It's a layperson against a big corporation. Sometimes, sir. But I would also say there are often times where we represent our claimants during the administrative process, and I will assure you, Your Honor, that we make sure that the administrative record contains all the necessary information. What was it that precipitated her taking the post-urography test, if that's what it is called, in October, the last one? It was her continuing treatment, Your Honor. My client continues to treat for this matter. She can – her life is stopped. I mean, Dr. Hopkins talks about – There is some suggestion in one of the reports that she's malingering, isn't there? And malingering, absolutely there is. Yeah, and that is – I mean, it's a suggestion in there. It is a suggestion. In the words of my old first sergeant, that would be pockycock, because if you look at this record, there is no sign of malingering. My client, Randy, talked about how hard a worker she was. When she came down with the vestibular surgery, she worked for a year with accommodations. It was only after those accommodations failed that she came to the realization that she could no longer work. How old is she?  It was in her early 40s, Your Honor. Young. What the Social Security disability people would call young, younger. So would I. I'm in my 40s, but I've got a few years in me, Your Honor. But I will say this much. She's not a malingerer, because a malingerer – No, I didn't say she was. I said there was a suggestion in the record. It was a suggestion. And I think it's key, because that is – along with this lack of objective evidence argument, it underlies their determination. And that's not – That's why they were looking for evidence. That's why they were looking for more than they received. Because it wasn't just malingering they suspected. They suspected that it's for – in English, it's all in her head. Right, yes. That she really believes she has this when she hears it. Well, but things that are in people's head can be really illness. They can be.  They can be. Okay. I'm out of time. Thank you very much. Go ahead. You can leave and finish that sentence. I would. Don't make it long. I won't make it too long. It's simply to address the malingering. She underwent – she worked with accommodations. She underwent surgery. And if you look at this record, she underwent and continues to undergo extensive physical therapy. Dr. Hopkins' comment about her wanting to become pregnant – she never became pregnant because of this disability. Thank you very much. Thank you very much, Your Honor. I appreciate it. Wow.